COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| VICTOR GOMEZ, | § | |
| Appellant, | § | No. 08-12-00001-CR |
| | § | Appeal from the |
| v. | § | Criminal District Court Number One |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC#20110D04048) |
| | § | |

## **O P I N I O N**

Appellant, Victor Gomez, appeals his convictions for engaging in organized criminal activity. We affirm.

## **BACKGROUND**

Jesus and Jose Vargas died after they were beaten, stabbed, and shot at the A & M Bar in Socorro, Texas, at which members of the Barrio Aztecas gang were present. In a five-count indictment, Appellant was charged with capital murder (Count I), and four counts of engaging in organized criminal activity (Counts II-V). Appellant was tried before a jury, which returned a verdict of not guilty on the capital murder charge (Count I) and two verdicts of guilty on the engaging in organized criminal activity charges (Counts II and III).[1] For Counts II and III, the

---

[1] The State abandoned Counts IV and V.

jury returned punishment verdicts of 45 years' confinement and assessed a fine of $5,000. The trial court imposed sentence in accordance with the jury's verdicts and directed that both sentences be served concurrently.

## DISCUSSION

Appellant raises four issues for our review. In Issue One, Appellant complains that the trial court abused its discretion during voir dire by impermissibly limiting his questioning of the venire members regarding their abilities to be fair and impartial in cases "dealing with multiple deaths and involvement of gangs." The State initially counters that Issue One is multifarious and presents nothing for our review because Appellant has combined two separate voir dire complaints regarding the trial court's rulings on the State's objections to his questions on multiple murders in a capital murder case and on gangs.

A multifarious issue embraces more than one specific ground. *Mays v. State,* 318 S.W.3d 368, 385 (Tex.Crim.App. 2010); *Smith v. State*, 316 S.W.3d 688, 694 (Tex.App. –Fort Worth 2010, pet. ref'd) (citations omitted). By combining more than one contention in a single issue, an appellant risks rejection on the ground that nothing is presented for review. *See Wood v. State*, 18 S.W.3d 642, 649 n.6 (Tex.Crim.App. 2000) (refusing to address multifarious grounds).

We may address contentions presented in a multifarious issue if they are sufficiently developed in the brief and preserved for our review. *Id.* TEX. R. APP. P. 33.1, 38.1. *Cf. Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex.Crim.App. 1995) (Court of Criminal Appeals unable to discern appellant's specific arguments from his brief and unwilling to brief appellant's case for him, overruled appellant's multifarious and inadequately-briefed issues challenging constitutionality of statute and trial court's failure to provide jury instruction in capital murder

case).  We agree that Issue One is multifarious.  While we disfavor Appellant's multifarious presentation of more than one contention in Issue One, because we are able to discern his arguments, we will address them.

To properly qualify jurors, counsel must explain the law to the panel and then ask whether they can follow that law regardless of personal views.  *See Threadgill v. State*, 146 S.W.3d 654, 667 (Tex.Crim.App. 2004).  A trial court has broad discretion over voir dire, including the propriety of particular questions.  *Murphy v. State*, 112 S.W.3d 592, 596 (Tex.Crim.App. 2003); *Barajas v. State,* 93 S.W.3d 36, 38 (Tex.Crim.App. 2002).  We leave to the trial court's discretion the propriety of a particular question and will not disturb the trial court's decision absent an abuse of discretion.  *Sells v. State*, 121 S.W.3d 748, 755 (Tex.Crim.App. 2003); *Barajas,* 93 S.W.3d at 38.  A trial court's discretion is abused only when a proper question about a proper area of inquiry is prohibited.  *Murphy*, 112 S.W.3d at 596; *Barajas,* 93 S.W.3d at 38.  A trial court's impermissible exclusion of a proper question during jury voir dire examination is subject to a harm analysis.  *Cena v. State,* 991 S.W.2d 283, 283 (Tex.Crim.App. 1999).

*Analysis*

A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Sells*, 121 S.W.3d at 756.  However, an otherwise proper question is impermissible if the question attempts to commit the juror to a particular verdict based on particular facts.  *Id.*  In addition, a trial judge may prohibit as improper a voir dire question that is so vague or broad in nature as to constitute a global fishing expedition.  *Id.*  The court may restrict voir dire where the questions are duplicitous or repetitious or where the venireman has already stated his or her position clearly and unequivocally; further, the court may restrict questions that are not in proper form.  *Dinkins v.*

3

*State,* 894 S.W.2d 330, 345 (Tex.Crim.App. 1995); *Moncada v. State*, 960 S.W.2d 734, 737 (Tex.App. –El Paso 1997, pet. ref'd).

Although appellant is authorized to ask proper questions in a particular area of inquiry, he is not entitled to ask questions in any particular form. *See Wright v. State*, 28 S.W.3d 526, 534 (Tex.Crim.App. 2000), *cert. denied,* 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001). Where the question is precluded because of improper form, and there is no absolute limitation placed on the underlying substance of a defendant's voir dire question, it is incumbent upon defense counsel to rephrase the improperly phrased question or waive the voir dire restriction. *See Wright*, 28 S.W.3d at 534 (if trial court merely limits a question due to its form, trial counsel must determine the basis of the limitation and attempt to fashion a query which complies with the perceived inadequacy; because appellant did not follow through in the area of inquiry, trial court did not abuse its discretion); *Howard v. State,* 941 S.W.2d 102, 110–11 (Tex.Crim.App. 1996); *Trevino v. State,* 815 S.W.2d 592, 601 (Tex.Crim.App. 1991); *Moncada*, 960 S.W.2d at 737(where no absolute limitation is placed on underlying substance of defendant's voir dire question, defense counsel must rephrase the improperly phrased question or waive the voir dire restriction).

During voir dire, defense counsel stated:

Again, we're talking about those emotions. . . . And I don't think that I could set those emotions aside in [a capital murder] case. And I would not be a good juror in a case, a capital murder case, because of that aspect, because of my emotions. And if anyone feels that way, I would ask that you raise your hand. . . . Juror No. 6? And by raising your hand, you're indicating that you can't be fair in this type of case?

The trial court interrupted and noted:

That's not the question you asked them. . . . So you ask a question and you'll get the answers to the question you asked. So, we're starting over.

4

Defense counsel then asked, "And because of the charge by itself, you just do not feel you could sit as a juror in this type of case?" to which several panel members answered, "No." He then asked, "[T]o those of you who did not raise your hands on my previous question, . . . is there anyone that feels if you add [the element of multiple deaths] it would affect you – you couldn't be fair and impartial in a case that charged capital murder and involved multiple deaths?" The trial court sustained the State's objection that this question was not proper voir dire. Defense counsel did not seek clarification of the trial court's ruling and, rather than rephrasing his question in the area of inquiry, defense counsel responded, "Moving along," and proceeded to pose questions regarding a case involving a handgun. He then asked, "If there's a case that you're presiding in that has an element of gang involvement, is that something that would affect your ability to be fair and impartial in that particular case?" The trial court sustained the State's objection that the question was improper. Defense counsel responded that he needed to discuss issues with the jury "to see how it would impact on their ability to be fair and impartial in this type of case." The trial court responded, "All right. Okay. The objection was sustained. Go on. Move on." Defense counsel did not seek the grounds for the trial court's ruling and did not attempt to pose restructured questions regarding gangs.

Defense counsel later approached the bench and explained that he was seeking to "get the jury's position on their ability to be fair and impartial in a case that involves gangs" because the case "involves a very dangerous prison gang, the Aztecas," and asked the court for leeway. The State responded that the charge of engaging in organized criminal activity involves criminal street gangs, noted that defense counsel had not talked about criminal street gangs in regards to the charged offense and appeared to seek to present the name of the criminal street gang before the

5

panel, and argued that defense counsel's inquiry constituted improper contracting and was not a permissible area of inquiry for voir dire. When the trial court asked defense counsel what his question was going to be, defense counsel answered, "[I]f there's an element of gangs in this case and you're seated as a juror, would that affect your ability to be fair and impartial?" The State again objected that the question was not proper, did not go to any challenge for cause that defense counsel could make, and was general in nature. The trial court observed, "Well, it would just be for his own edification. . . . He's saying it would make it difficult for them to be fair and impartial and that's putting it at the end of it." After the trial court sustained the State's objection, it asked if defense counsel had anything he wished to present. Defense counsel stated that he did not and did not seek to pose any reformed voir dire questions regarding gangs.

The trial court did not bar Appellant from posing proper voir dire questions regarding multiple deaths or gangs. Rather, the trial court merely sustained the State's objection to the questions on those matters. Appellant did not rephrase his "multiple deaths" question or continue his line of questioning on this matter but instead proceeded to pose questions regarding a weapon. Appellant did not rephrase his "gangs" question but proceeded to ask a media coverage question. Appellant failed to attempt to determine the basis of the trial court's rulings on the State's objections to his questions regarding multiple deaths or gangs or to comply with those rulings. *Wright*, 28 S.W.3d at 534.

Because the trial court did not prohibit a proper questioning about a proper area of inquiry, and because Appellant failed to attempt to determine the basis for the trial court's rulings regarding his "multiple deaths" and "gangs" questions and failed to attempt to pose proper questions in conformity with the bases for the trial court's rulings, the trial court did not abuse its discretion.

6

*See Sells*, 121 S.W.3d at 755; *Wright*, 28 S.W.3d 526, 534; *Murphy*, 112 S.W.3d at 596; *Barajas,* 93 S.W.3d at 38.   Issue One is overruled.

In Issue Two, Appellant complains that the State's questioning of witnesses Orozco and Gallegos, who the State and trial court knew would invoke their Fifth Amendment privilege after they were granted use immunity, violated his right to due process because the witnesses' refusal to answer the State's questions invited the jury to assume that their answers would have been in the affirmative.   *See* U.S. CONST. AMEND. V.   We disagree.

A person to whom immunity has been granted for his testimony has no valid basis for refusing to testify.  *Butterfield v. State*, 992 S.W.2d 448, 449-50 (Tex.Crim.App. 1999).   The State is permitted to compel the testimony of a witness to whom use immunity has been granted, and where the State does not ask the witness fact-laden questions from which the defendant's guilt may be inferred and does not comment on the witness's refusal to testify, the defendant does not suffer unfair prejudice.   *Perez v. State*, 41 S.W.3d 712, 720 (Tex.App. –Corpus Christi 2001, no pet.).   A person who refuses to testify after being granted immunity may be punished with contempt.  *Butterfield*, 992 S.W.2d at 449-50.

*Analysis*

In support of Issue Two, Appellant relies on several cases which we find factually distinguishable from the facts before us.  In *Washburn v. State*, 164 Tex.Crim. 448, 451, 299 S.W.2d 706, 708 (1956), the Court of Criminal Appeals held the trial court erred when it permitted the State to call Washburn's co-defendant as a witness.   There, the trial court required the co-defendant, in the presence of the jury, to claim his privilege against self-incrimination and refuse to testify on the basis that his testimony might incriminate him.   *Id.*   The Court concluded

7

this was prejudicial because the co-defendant's refusal to testify could be used as an incriminating fact against Washburn. *Id.* In *Washburn*, the trial court had not granted immunity to the co-defendant. *Id*. at 707.

Appellant next relies on *Coffey v. State*, 796 S.W.2d 175, 179 (Tex.Crim.App. 1990), wherein the Court determined that where the State could have sought to compel the testimony of a witness who had been granted use immunity and had no basis for refusing to testify, Coffey was not unfairly prejudiced. Noting that a jury may consider an invocation of a Fifth Amendment privilege under some circumstances, the *Coffey* Court observed that "[t]he fatal flaw in appellant's reasoning is the unstated assumption that any negative inference made by a jury when a witness refuses to testify is improper." *Coffey*, 796 S.W.2d at 178. In a footnote, the Court additionally observed that it would have been error for the State to ask the witness "a series of damaging questions in such a way as to invite the jury to assume that the answers to each question would have been in the affirmative." *See Coffey*, 796 S.W.2d at 179 n.6.

Appellant also directs us to *Taylor v. State*, 653 S.W.2d 295, 298-301 (Tex.Crim.App. 1983), wherein the Court reversed the trial court judgment because the State called a witness, knowing that the witness did not wish to testify, and asked her, "[D]o you recall on August the 6th of 1979, signing a voluntary statement for an investigator . . . stating that your husband . . . here shot Pun'kin?," "Do you recall signing a statement saying that your husband . . . shot Rat?," "Do you recall in that statement stating that your husband robbed Big Lawrence of the Preludin?,"and "Do you recall telling the investigator . . . that you were driving the car?" *Id*. at 299 (emphasis omitted). The witness repeatedly refused to testify on the basis that her testimony may incriminate her. In *Taylor*, the witness was a co-defendant to whom no offer of immunity had

been made or granted. *Id.*

In the case before us, the State offered use immunity to witnesses Jesus Ivan Orozco and Jesus Gallegos and each refused the State's offer. The trial court ordered that each witness be provided use immunity and separately instructed the witnesses that, other than the commission of perjury, the grant of use immunity cloaked each of them from prosecution for matters about which they would provide testimony. The trial court then ordered Orozco and Gallegos to testify.

After Orozco initially answered some of the State's questions, he then repeatedly attempted to assert a Fifth Amendment privilege and stated that he did not want to testify despite the trial court and the State informing Orozco that he had no such privilege. After the trial court sustained defense counsel's objection that Appellant had made it clear that he refused to testify, the State asserted that it was permitted to ask each individual question of the witness. Over Appellant's objections, the trial court allowed the State to pose its questions.

The questions the State asked Orozco included whether Appellant had informed Orozco: (1) about the incidents that occurred at the bar; (2) about a fight inside the bar; and (3) that Appellant was one of three individuals "involved in the A & M bar[.]" Orozco similarly refused to answer when the State asked Orozco whether he had informed the El Paso Sheriff's Department: (1) that Appellant had told Orozco that Appellant was involved in "the A & M Bar case;" (2) that Azteca gang members were at Appellant's house when Orozco was present; and (3) that a person known as "Turtle" had informed Orozco that he had burned Appellant's pants and shirt on the night of the A & M Bar shooting because they had blood on them.

Gallegos, too, refused to testify and answered, "No comment," when the State asked Gallegos whether he had told the El Paso Sheriff's Department that he: (1) had been at the A & M

9

Bar on June 22, 2009; (2) had seen "[Zuniga], [Appellant,] and a tall guy with glasses;" (3) had seen Appellant and the guy with glasses arguing with "Froggy" and "Caveman;" and (4) had helped separate the fight. Gallegos also answered, "No comment," when the State asked whether Zuniga had told Gallegos on June 22, 2009, that Gallegos "had to do the job . . . to take care of the incident with Froggy and Caveman."

We conclude the State's examination of Orozco and Gallegos did not unfairly prejudice Appellant. Unlike the cases cited by Appellant, Orozco and Gallegos were not co-defendants. Because the trial court had granted each of them use immunity, Orozco and Gallegos had no Fifth Amendment privilege to invoke as a basis for refusing to testify. The State's questions were not fact-laden, that is, they did not contain sufficient facts to suggest how the crime was committed, and did not otherwise present the State's theory of the case as to permit the jury to infer Appellant's guilt or to unfairly prejudice him. *See Perez*, 41 S.W.3d at 719-20. With regard to Orozco's and Gallegos' refusals to testify, in its charge the trial court reminded the jury that "what the lawyers say is not evidence and you are only to consider the evidence that came from the witness stand and those items that were admitted into evidence." In sum, the trial court did not err in permitting the State to ask these questions.

Moreover, Appellant has not shown any harm and we observe that any error would have been harmless as the jury was presented with evidence from other witnesses that placed Appellant at the bar, described Appellant's discussions with Zuniga, showed Appellant's participation in fights that night at the bar, and established that Appellant had made audible admissions to a passenger on the Sheriff's bus that he had gone to the bar to collect a fee from the victims and had stabbed one of them. Therefore, the alleged error did not contribute to Appellant's conviction or

10

punishment.   TEX.R. APP. P. 44.2(a).   Issue Two is overruled.

In Issue Three, Appellant complains the trial court erred in permitting Dr. Juan Contin to testify as an expert after he utilized an autopsy report prepared by another medical examiner, Dr. Paul Shrode, in order to form his own opinion, and thereby abridged Appellant's right to confrontation.

*Standard of Review*

We review the admission of evidence by the trial court for an abuse of discretion. *McDonald v. State,* 179 S.W.3d 571, 576 (Tex.Crim.App. 2005).   If the trial court's decision is within the zone of reasonable disagreement, we will not disturb it on appeal.   *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991). When deciding whether the admission of certain statements violated a defendant's right to confrontation, however, we review the trial court's ruling de novo.   *Wall v. State,* 184 S.W.3d 730, 742–43 (Tex.Crim.App. 2006).

*Analysis*

The Confrontation Clause of the Sixth Amendment, made applicable to the States via the Fourteenth Amendment, *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that all criminal defendants have the right to confront any witnesses against them. U.S. CONST. AMEND. VI; *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

In *Crawford v. Washington,* the United States Supreme Court held that testimonial hearsay statements of witnesses absent from trial are admissible over a Confrontation Clause objection only when the declarant has been shown to be unavailable and where the defendant has had a prior opportunity to cross-examine the declarant.   *Crawford v. Washington,* 541 U.S. 36, 57-60, 124

11

S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 311 129 S.Ct. 2527, 2531-32, 174 L.Ed.2d 314 (2009), the Supreme Court held that forensic analysts' affidavits, the sole purpose of which was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance, were testimonial statements, and the analysts were witnesses for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that defendant had a prior opportunity to cross-examine them, the Court concluded the defendant was entitled to confront the analysts at trial. *Id*. at 311, 129 S.Ct. at 2532.

In *Bullcoming v. New Mexico*, --- U.S. --- , 131 S.Ct. 2705, 2710, 180 L.Ed.2d 610 (2011), on which Appellant relies, the United States Supreme Court considered whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. The Supreme Court held that surrogate testimony of that order does not meet the constitutional requirement and that the accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist. *Id.*

The following year, in *Williams v. Illinois*, --- U.S. --- , 132 S.Ct. 2221, 2228, 183 L.Ed.2d 89 (2012), the United States Supreme Court observed:

> For more than 200 years, the law of evidence has permitted the sort of testimony that was given by the expert in this case. Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert. While it was once the practice for an expert who based an opinion on assumed facts to testify in the form

12

of an answer to a hypothetical question, modern practice does not demand this formality and, in appropriate cases, permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts.

Because the Confrontation Clause has no application to out-of-court statements that are not offered to prove the truth of the matter asserted, the Supreme Court concluded that this type of expert testimony did not violate the defendant's right of confrontation in *Williams*. *Williams*, 132 S.Ct. at 2228. Rather, the Supreme Court observed, "When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth." Thus, out-of-court statements related by an expert solely for the purpose of explaining the assumptions on which the expert's opinion rests are not offered for their truth and fall outside the scope of the Confrontation Clause. *Williams*, 132 S.Ct. at 2228.

Here, Dr. Contin reviewed the autopsy photos and Dr. Shrode's autopsy reports of Jesus and Jose Vargas. At trial, Dr. Contin testified regarding the injuries to Jesus's and Jose's bodies as observed from their autopsy photos and opined that each man's cause of death was a gunshot wound to his head. There is no evidence that the autopsy reports were prepared for use in Appellant's trial. The reports were not admitted into evidence for the truth of any matter asserted therein, and their contents were utilized for the sole purposes of explaining the assumptions on which Dr. Contin was basing his independent judgment and opinion. Moreover, Appellant cross-examined Dr. Contin regarding his conclusions and elicited testimony that Dr. Shrode had conducted the autopsies.

Because Dr. Shrode's autopsy reports regarding Jesus and Jose were related by Dr. Contin solely for the purposes of explaining the assumptions on which he was basing his opinions regarding the deaths and because the autopsy reports were not offered for their truth, the autopsy

13

reports fall outside the scope of the Confrontation Clause. *Williams*, 132 S.Ct. at 2228.
Moreover, the alleged error did not contribute to Appellant's conviction or punishment as
Appellant was acquitted of capital murder and other witness testimony establishes Appellant's
discussion with Zuniga, his presence at the bar, his involvement in the bar fight, and his
admissions made while on the Sheriff's bus. TEX. R. APP. P. 44.2(a). Issue Three is overruled.

In Issue Four, Appellant alleges the evidence is legally and factually insufficient to support
his convictions for engaging in organized criminal activity. We initially observe that challenges
to the factual sufficiency of the evidence have been abolished. *See Brooks v. State*, 323 S.W.3d
893, 895 (Tex.Crim.App. 2010). We therefore restrict our review to Appellant's legal sufficiency
challenge.

We also observe that Appellant's brief makes a cursory reference to Detective Gibson's
"self-proclaimed" status as an expert witness on gangs, their activities, and membership. The
State has responded to this comment and has provided a thorough analysis of Detective Gibson's
training, expertise, and experience, and testimony, and how they each satisfy the *Nenno*
framework for analyzing the reliability of expert testimony in "non-scientific" fields.[2] *See Nenno
v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App. 1998), *overruled on other grounds by State v.*

---

[2] Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. The Court of Criminal Appeals has explicitly refrained from developing rigid distinctions between "hard" science, "soft" sciences, and nonscientific testimony because it recognizes that the distinction between various types of testimony may often be blurred. *Morris v. State*, 361 S.W.3d 649, 654-55 (Tex.Crim.App. 2011). The Court has set forth a three-question framework for evaluating the reliability of expert testimony in fields of study outside the hard sciences. *See Morris*, 361 S.W.3d at 654-55; *Nenno v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex.Crim.App. 1999). The questions to be considered are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. *Morris*, 361 S.W.3d at 654-55.

14

*Terrazas*, 4 S.W.3d 720, 727 (Tex.Crim.App. 1999). However, Appellant presents no issue, makes no contention, and presents no analysis challenging Detective Gibson's qualifications as an expert witness on the subject of gangs or the reliability of his expert testimony in relation thereto. Instead, Appellant summarily recites Detective Gibson's testimony. Because we conclude Appellant has presented no issue challenging the qualifications of Detective Gibson to testify as an expert, we decline to address this matter. *See* TEX. R. APP. P. 38.1(f), (i) (appellant's brief must state concisely all issues or points presented for review and must contain a clear and concise argument for the contentions made).

*Standard of Review*

In conducting our legal sufficiency review, we examine all of the evidence in a light most favorable to the verdict, both admissible and inadmissible, in order to determine whether any rational trier of fact could have found the essential elements of the crime as alleged in the application paragraph of the charge to the jury beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). We do not reexamine the evidence and impose our own judgment as to whether the evidence establishes guilt beyond a reasonable doubt, but determine only if the findings by the trier of fact are rational. *See Lyon v. State,* 885 S.W.2d 506, 516-17 (Tex.App.–El Paso 1994, pet. ref'd).

The fact finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Lancon v. State,* 253 S.W.3d 699, 707 (Tex.Crim.App. 2008). Therefore, we do not resolve any conflicts of fact or assign credibility to the witnesses. *See Lancon,* 253 S.W.3d at 707; *Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App. 1992);

15

*Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App. 1991); *Belton v. State,* 900 S.W.2d 886, 897 (Tex.App. –El Paso 1995, pet. ref'd). We must resolve any inconsistencies in the testimony in favor of the verdict. *Lancon,* 253 S.W.3d at 707.

This standard of review for sufficiency of the evidence on appeal is the same for both direct and circumstantial evidence cases. *See Powell v. State,* 194 S.W.3d 503, 506 (Tex.Crim.App. 2006); *Garcia v. State,* 871 S.W.2d 279, 280 (Tex.App. –El Paso 1994, no pet.). If we sustain a legal sufficiency challenge, we must render a judgment of acquittal. *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App. 1996).

*Analysis*

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically-correct jury charge. *Villarreal v. State,* 286 S.W.3d 321, 327 (Tex.Crim.App. 2009), *citing Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). A hypothetically-correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* The law, as authorized by the indictment, means the statutory elements of the charged offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex.Crim.App. 2000).

A person commits the offense of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or conspires to commit one or more of certain enumerated offenses. TEX. PENAL CODE ANN. § 71.02(a) (West Supp. 2013). Section 71.01(d) of

16

the Texas Penal Code defines a criminal street gang as three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities.   TEX. PENAL CODE ANN. § 71.01(d) (West 2011).

Aggravated assault is an enumerated offense of Section 71.02(a).   TEX. PENAL CODE ANN. §§ 22.02(a)(1), 71.02(a) (West 2011 & Supp. 2013).   A person commits an assault if the person intentionally, knowingly, or recklessly causes bodily injury to another. TEX. PENAL CODE ANN. § 22.01(a)(1) (West Supp. 2013).   "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (West Supp. 2013).   A person commits aggravated assault if the person commits assault as defined in section 22.01 and the person: (1) causes serious bodily injury to another, or (2) uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. § 22.02(a)(1), (2) (West 2011).   A "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."   TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2013). The term "serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."   TEX. PENAL CODE ANN. § 1.07(a)(46) (West Supp. 2013).

Appellant was charged with engaging in organized criminal activity by committing aggravated assault "as a member of a criminal street gang."   Counts II and III of Appellant's indictment specifically charged:

> [T]hat on or about the 22nd day of June, 2009 and anterior to the presentment of this indictment, in the County of El Paso and State of Texas, VICTOR GOMEZ, hereinafter referred to as Defendant, did then and there, as a member of a criminal street gang, to-wit: Barrio Azteca, commit the criminal offense of Aggravated

17

Assault against Jose Vargas [Count II, and Jesus Vargas, Count III].

Because neither the indictment nor the jury charge required any proof of intent concerning the criminal street gang, we determine whether the evidence is legally sufficient to prove that appellant committed the underlying aggravated assault with the requisite intent by using a hypothetically-correct jury charge. *See* TEX. PENAL CODE ANN. § 71.02(a) (West Supp. 2013); *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App. 1997) (en banc); *see also See Fisher v. State,* 887 S.W.2d 49, 55–58 (Tex.Crim.App. 1994), *overruled on other grounds by Malik,* 953 S.W.2d at 234) (where indictment and jury charge are similarly defective, hypothetically-correct jury charge should allege all elements as set forth in the controlling penal statute in order not to unconstitutionally broaden basis on which State may obtain conviction). Therefore, under a hypothetically-correct jury charge the State was required to prove beyond a reasonable doubt that Appellant committed aggravated assault with a deadly weapon with the intent to establish, maintain, or participate . . . as a member of a criminal street gang, to-wit: Barrio Azteca.

Appellant specifically asserts that the State was required to prove that he agreed with one or more persons to engage in conduct that would constitute the underlying offense and that he and one or more of them performed an overt act in furtherance of the agreement. Appellant contends the State failed to prove beyond a reasonable doubt that he committed "these offenses" because it failed to show that he committed an overt act as a member of a criminal street gang. Appellant complains that the evidence is legally insufficient to support his conviction because the evidence only establishes that he was present at the A & M Bar, that no credible evidence demonstrates his participation in the attack of Jesus and Jose, and only one witness, standing "at least 50 feet away in a very dark area," identified him as being in the area where Jesus and Jose were being beaten.

18

We disagree.

Because the overt act element of organized criminal activity need not be criminal in itself, acts that suffice for party liability, that is, acts that encourage, solicit, direct, aid, or attempt to aid the commission of the underlying offense, also satisfy the overt act element of section 71.02. *See* TEX. PENAL CODE ANN. § 71.02(a) (West Supp. 2013); *Otto v. State*, 95 S.W.3d 282, 284 (Tex.Crim.App. 2003).

The State presented to the jury photographs of Appellant displaying the Barrio Azteca gang sign, as well as testimony of Detective Gibson that Appellant, Ricardo Zuniga, Joe Alarcon, and Jose Cordero are confirmed members of the Barrio Azteca gang, which the FBI considers the most problematic gang in the El Paso region.[3] Detective Gibson testified that Zuniga is a lieutenant and Appellant is ranked as a corporal or soldier in the Barrio Azteca gang. He described a "green light" to be a directive from the Barrio Azteca leadership to assault or kill another person. Detective Gibson explained that Jesus and Jose Vargas's actions in stopping Zuniga during a prior assault would be considered an affront to Zuniga's respect, and that the attack on the Vargas brothers was a response consistent with the known activities of the Barrio Azteca gang. He further explained that the Barrio Azteca gang secures its income through its narcotics trade which includes the extortion of money, also known as a "cuota" or "tax," from other narcotics dealers, and enforces its collection of money through the commission of aggravated assaults, murders, robberies and aggravated robberies, burglaries, forgeries, and witness tampering.

Because of the Barrio Azteca's violent nature, Raul Reyes, the coordinator for the security-threat group at the El Paso County Detention Facility, testified that his job was to determine whether an inmate was a member of the Barrio Azteca gang, a security-threat group.

---

3 Detective Gibson had previously been assigned to the FBI's task force on gangs.

He explained that the determination of an inmate's gang membership was made by a three-person panel, and testified that Appellant, Jose Guadalupe Cordero, Jose Ivan Alarcon, and Ricardo Zuniga are confirmed members of the Barrio Azteca gang.

Witnesses identified Appellant as being present at the A & M Bar on the evening when Jesus and Jose Vargas were beaten and killed. One witness testified that Zuniga spoke with a man. When Zuniga then informed Appellant that "those guys" owed him money, Appellant told Zuniga to "leave it alone." Zuniga instructed Appellant that he needed to go with him, to which Appellant answered, "Yes," and noted that he would "go later."

Another witness testified that she observed Appellant arguing and fighting with a group of people at the bar, and then saw Appellant fight with an individual. When the person fell to the ground, Appellant continued to assault that person by kicking him.

A passenger present with Appellant while being transported on an El Paso County Detention Facility bus, testified that he heard Appellant state that he had gone to the A & M Bar and asked the victims for a fee, and then stabbed one of them. The witness also heard Appellant state that "Joe" had beaten one victim and Zuniga had shot one of the victims. After Appellant's arrest, Detective Antonio Arias of the El Paso Sheriff's Office testified he saw scratches to Appellant's forehead, right torso, back, and right arm, and observed an injury to Appellant's foot.

Dr. Contin testified that Jesus Vargas had been struck with fists or had been kicked, shot in the neck, stabbed with a single-edged knife, and stabbed in the skull with an ice pick, part of which had broken off in Jesus's skull. He testified that Jose Vargas had suffered a gunshot to the head, injuries to his eyes that may have been caused by being struck by hands or feet or by a bullet, and contusions and stab wounds caused by a single-edged instrument.

20

After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson,* 364 S.W.3d at 293–94; *Brooks,* 323 S.W.3d at 898–99. We conclude the evidence is legally sufficient to support the jury's verdict that Appellant engaged in organized criminal activity by committing aggravated assault upon Jesus and Jose Vargas. *Cf. Hernandez v. State,* 52 S.W.3d 268, 278 (Tex.App. –Corpus Christi 2001, no pet.) (upholding active gang member's conviction for engaging in organized criminal activity where gang had identifiable sign, leadership, and engaged in drug transactions and murder). Issue Four is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

GUADALUPE RIVERA, Justice

July 11, 2014

Before McClure, C.J., Rivera, and Rodriguez, JJ.

(Do Not Publish)

21